**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK** ORIGINAL
-------------------------------------------------------------------X

PAUL MARTINEZ,

Plaintiff,

**07 CIV. 1942**

Index:

- against -

**COMPLAINT**

COMMUNICATIONS WORKERS OF AMERICA
LOCAL 1120, AFL-CIO, GLENN A. CARTER AS
PRESIDENT OF THE COMMUNICATIONS
WORKERS OF AMERICA LOCAL 1120, AFL-CIO,
PM SAVVY FLEET SERVICE, INC.,
KEVIN B. PETERS, and JOHN DOE,

**JUDGE CONNER**

Defendants.

-------------------------------------------------------------------X

Plaintiff, Paul Martinez, by his Attorney, Barry D. Haberman, Esq., complaining

of the Defendants, Communications Workers of America Local 1120, AFL-CIO 1120,

Glenn A. Carter as President of the Communications Workers of America Local 1120,

AFL-CIO, PM Savvy Fleet Service, Inc. Kevin B. Peters, and John Doe, respectfully

alleges as follows:

1.      Plaintiff, Paul Martinez, herein referred to as "Martinez" is a New York

resident domiciled at 92 Ball Street, #1, Port Jervis, NY 12771.

2.      Said domicile of Plaintiff, "Martinez", is located in the jurisdiction of the

Southern District of New York, United States of America.

3.      Upon information and belief, Defendant, Glenn A. Carter, herein referred

to as "Carter" is the President of Defendant, Communications Workers of America Local

1120, AFL-CIO, herein referred to as "Local 1120."

4.      Upon information and belief, Defendant, "Local 1120" is a General

Association located at 157 Van Wagner Road, Poughkeepsie, New York 12603.

1

5.      Upon information and belief, Defendant, "Local 1120" is a labor organization representing employees in an industry affecting commerce as defined in 29 U.S.C. sec. 142(1).

6.      Upon information and belief, Defendant, "Carter" conducts business at 157 Van Wagner Road, Poughkeepsie, New York 12603.

7.      Upon information and belief, Defendant, "Local 1120" and Defendant, "Carter" are subject to the jurisdiction of the Southern District of New York.

8.      Upon information and belief, the Defendant, PM Savvy Fleet Service, Inc, herein referred to as "Savvy" is a New York Corporation.

9.      Upon information and belief, the principal place of business of the Defendant, "Savvy" is located at 173-12 Horace Harding Expressway, Fresh Meadows, New York, 11365.

10.     Upon information and belief, the Defendant, "Savvy" performs services on an ongoing basis at locations located in the Southern District of New York.

11.     Upon information and belief, Defendant, "Savvy" is subject to the jurisdiction of the Southern District of the State of New York

12.     Upon information and belief, Defendant, Kevin B. Peters, herein referred to as "Peters" is the Director of Operations for the Defendant, "Savvy."

13.     Upon information and belief, Defendant, "Peters" actual place of business is located at 173-12 Horace Harding Expressway, Fresh Meadows, New York, 11365.

14.     Upon information and belief, the Defendant, "Peters" performs services on an ongoing basis at locations located in the Southern District of New York.

15.     Upon information and belief, Defendant, "Peters" is subject to the jurisdiction of the Southern District of the State of New York.

16.     Upon information and belief, Defendant, *John Doe*, is an unidentified individual responsible for the administration of the Defendant, "Savvy's" health care plan pursuant to the provisions of Consolidated Omnibus Budget Reconciliation Act of 1985, herein referred to as "COBRA", 29 U.S.C. sec. 1161-1168.

17.     The dominant subject matter of this Verified Complaint is grounded in 29 U.S.C. sec. 185(a), Section 301 of the Labor Management Relations Act, "LMRA" and "COBRA", 29 U.S.C. sec. 1161-1168.

18.     Under 29 U.S.C. sec. 185(a) and (c), Section 301 of the Labor Management Relations Act, "LMRA" suits alleging a violation of a contract between an employer and a labor organization are permitted to be brought before the District Courts of the United States.

19.     Under "COBRA", 29 U.S.C. sec. 1161-1168 suits alleging a violation of a "COBRA" are permitted to be brought before the District Courts of the United States.

20.     As the Defendant, "Local 1120", principal office is located in the Southern District of New York and as the duly authorized officers and agents of the Defendant, "Local 1120" (specifically, Defendant, "Carter") is engaged in representing members of the Defendant, "Local 1120"in the Southern District of New York, under 29 U.S.C. sec. 185(c)(1) and (2), Section 301 of the Labor Management Relations Act, "LMRA", the Southern District of New York is the proper venue for this action.

21.     The Plaintiff, "Martinez" demands a jury trial to resolve all issues in this action.

## AS AND FOR A FIRST CAUSE OF ACTION

22.    The Plaintiff, "Martinez" repeats and reiterates each and every allegation hereinbefore set forth, with the same force and effect as if set forth herein.

23.    At all times relevant to this action, Plaintiff, "Martinez" was a member in good standing of Defendant, "Local 1120."

24.    Upon information and belief, the Plaintiff, "Martinez" was employed by Defendant, "Savvy" from May 1, 2005 through September 6, 2006.

25.    Upon information and belief, the Plaintiff, "Martinez" was employed by Butler Fleet Services, Inc., herein referred to as "Butler" from August 1996 through April 30, 2005.

26.    Upon information and belief, the Plaintiff, "Martinez" while in the employ of first "Butler" and then Defendant, "Savvy" performed services pursuant to a contract between Verizon and "Butler" and then between Defendant, "Verizon" and Defendant, "Savvy."

27.    Upon information and belief, "Butler" performed services for Defendant, "Verizon" pursuant to a contractual agreement.

28.    Upon information and belief, Defendant, "Savvy" performed services for Verizon pursuant to a contractual agreement

29.    Upon information and belief, the Communications Workers of America, AFL-CIO, District One, herein referred to as "District One" was the exclusive bargaining representative for collective bargaining for all the employees of "Butler" and then Defendant, "Savvy" who were classified as Mechanical Maintenance personnel servicing Verizon's fleet of vehicles.

4

30.    Upon information and belief, Defendant, "1120" represented those employees of Defendant, "Savvy" performing services for Verizon in a specific geographical location.

31.    Upon information and belief, pursuant to the terms of the Agreement between "District One" and Defendant, "Savvy", seniority is defined as continuous service with the employer (Defendant, "Savvy") and the prior employer "Butler", beginning on the date that the employee began work.

32.    Upon information and belief, at all times relevant to this action, the Plaintiff, "Martinez" was a member in good standing of "District One."

33.    Upon information and belief, at all times relevant to this action, the Plaintiff, "Martinez" was a member in good standing of Defendant, "Local 1120."

34.    At all times relevant to this action, the Plaintiff, "Martinez" was employed by the Defendant, "Savvy" pursuant to a Collective Bargaining Agreement between Defendant, "Savvy" and "District 1."

35.    Upon information and belief, said Collective Bargaining Agreement between Defendant, "Savvy" and "District 1" is effective from May 1, 2005 through April 30, 2009. (See Exhibit 1 attached herein.)

36.    Upon information and belief, pursuant to said Collective Bargaining Agreement, the Plaintiff, "Martinez" is represented by Defendant, "Local 1120."

37.    On or about August 14, 2006, the Plaintiff, "Martinez" was suspended, without pay, by Defendant, "Savvy."

38.    Upon information and belief, the suspension of the Plaintiff's employment was at the direction of Verizon.

39.    Upon information and belief, on or about August 24, 2006, the Defendant, "Savvy" denied the Plaintiff's Second Step Grievance. The notification of the denial of the grievance was communicated from Defendant, "Savvy" to Defendant, "Local 1120" and to Defendant, "Carter" on or about September 6, 2006.

40.    The denial of the Second Step Grievance was not communicated from the Defendants, "Local 1120" and "Carter" to the Plaintiff, "Martinez" until January 8, 2007.

41.    Upon information and belief, the Defendants, "Local 1120" and "Carter" have never processed the Third Step of the Grievance procedure as required to in the Collective Bargaining Agreement (See Exhibit 1, Article 15.04 of said Collective Bargaining Agreement)

42.    At all times relevant herein, the Plaintiff, "Martinez" satisfactorily performed his duties of employment.

43.    Upon information and belief, the Defendant, "Savvy" failed to abide by the provisions of Article 16.03 of the Collective Bargaining Agreement, which requires progressive discipline. (See Exhibit 1.)

44.    Upon information and belief, the Plaintiff, "Martinez" never received a written warning, a one-day suspension without pay and/or a three-day suspension without pay in accordance with the provision of Article 16.03 of the Collective Bargaining Agreement. (See Exhibit 1.)

45.    Furthermore, neither Defendant, "Savvy" nor Defendant, "Local 1120" nor Defendant, "Carter" permitted the Plaintiff, "Martinez" to participate in any meaningful fashion in the grievance procedure. The Plaintiff, "Martinez" was not part of the process, and was denied the opportunity to contest the charges of Defendant,

6

"Savvy", nor was the Plaintiff, "Martinez" provided the opportunity to give testimony in his own behalf.

46.     As a result of the foregoing, Defendant, "Savvy," Defendant, "Local 1120" and Defendant, "Carter" have jointly and severally breached the Collective Bargaining Agreement which exists for the benefit of the Plaintiff, "Martinez."

47.     During the calendar year 2006, the Plaintiff, "Martinez" had gross earnings of $1,224.59 per week.

48.     As of the date of this Complaint, the Plaintiff, "Martinez" has been wrongfully deprived of 29 weeks of gross compensation, or the sum of $35,513.21.

49.     The Plaintiff, "Martinez" has also been deprived of the value of the Pension and Welfare Program including but not limited to various pensions and medical insurance coverage as defined by Article 30.01 of the Collective Bargaining Agreement. (See Exhibit 1.)

50.     The Plaintiff, "Martinez" seeks, the value of said pensions and medical coverage from the date of his wrongful termination of employment forward.  The value of said pensions and medical coverage to be determined at trial.

51.     The Plaintiff, "Martinez" also seeks all out of pocket medical expenses incurred by the Plaintiff, "Martinez" from the end of his employment through the date that this action is determined.  The amount of said out of pocket medical expenses to be determined at trial.

52.     Thus there is now due and owing from Defendant, "Savvy," Defendant, "Local 1120" and Defendant, "Carter" jointly and severally the amount of $35,513.21, plus the value of the deprived Pension and Welfare Program and out of pocket medical

expenses, plus compensation in amount to be determined at trial that the Plaintiff would have earned had the Defendants abided by the terms of the Collective Bargaining Agreement, all such monies due to the Plaintiff for the breach of the Collective Bargaining Agreement.

## AS AND FOR A SECOND CAUSE OF ACTION

53.    The Plaintiff, "Martinez" repeats and reiterates each and every allegation hereinbefore set forth, with the same force and effect as if set forth herein.

54.    During the relevant time period, the Plaintiff, "Martinez" was a member of Defendant, "Local 1120" of whom Defendant, "Carter" was President.

55.    Upon information and belief, the Plaintiff, "Martinez" was represented by Defendant, "Local 1120" and Defendant, "Carter" as concerns his employment by Defendant, "Savvy."

56.    Upon notification of the suspension, pending termination from employment, Plaintiff, "Martinez" contacted Defendant, "Local 1120" to grieve said suspension and pending termination.

57.    The basis for the grievance is the fact that the Defendant, "Savvy" failed abide by the provisions of the Collective Bargaining Agreement, specifically, Article 16.03, progressive discipline.

58.    Upon information and belief, the Defendants, "Local 1120" and "Carter", failed to process said grievance in accordance with Article 15.04 of the Collective Bargaining Agreement, which requires said Defendants to process the grievance to a Third Step, by referring the dispute to the New York State Mediation Board.

59.    Upon information and belief, Defendants, "Local 1120" and "Carter", failed provide the Plaintiff, "Martinez" a forum to prosecute his grievance.

60.    Upon information and belief, Defendants, "Local 1120" and "Carter", failed provide the Plaintiff, "Martinez" any opportunity to participate as concerns any proceeding invested to determine the continuation of the Plaintiff's employment.

61.    By failing to continue the prosecution of the meritorious grievance, Defendants, "Local 1120" and "Carter" breached their duty of fair representation to the Plaintiffs.

62.    Upon information and belief, Defendants, "Local 1120" and "Carter" breach of the fair duty of representation was due to the Plaintiff, "Martinez" crossing a picket line in 2000.

63.    Upon information and belief, "District One" the parent body of Defendant, "Local 1120" published the Plaintiff's name and workplace in 2000 labeling said Plaintiff a "scab."

64.    Upon information and belief, Defendants, "Local 1120" and "Carter" knew about the Plaintiff's crossing of a picket line, and hence, said Defendants, Defendants, "Local 1120" and "Carter" made a determination not to provide proper assistance to the Plaintiff in contesting the termination of employment by Defendant, "Savvy."

65.    The breach of the duty of fair representation by Defendants, "Local 1120" and "Carter" caused damages to the Plaintiff, "Martinez" in the amount of $35,513.21, plus the value of the deprived Pension and Welfare Program and out of pocket medical expenses, plus compensation in amount to be determined at trial that the Plaintiff would

have earned had the Defendants, "Local 1120" and "Carter" abided by the terms of the Collective Bargaining Agreement, all such monies due to the Plaintiff for the breach of the duty of fair representation by Defendants, "Local 1120" and "Carter" against the interests of the "Plaintiff.

66.    Thus there is now due and owing from Defendants, "Local 1120" and "Carter", jointly and severally, to the Plaintiff the amount of $35,513.21, plus the value of the deprived Pension and Welfare Program and out of pocket medical expenses, plus additional compensation in an amount to be determined at trial for the breach of the duty of fair representation by Defendants, "Local 1120" and "Carter"" against the interests of the Plaintiff, "Martinez."

## AS AND FOR A THIRD CAUSE OF ACTION

67.    The Plaintiff, "Martinez" repeats and reiterates each and every allegation hereinbefore set forth, with the same force and effect as if set forth herein.

68.    Under the provisions of Consolidated Omnibus Budget Reconciliation Act of 1985, herein referred to as "COBRA" the Plaintiff, "Martinez" was entitled, as a matter of law, to information from the employer, the Defendant, "Savvy" to enable said Plaintiff, "Savvy" to elect to maintain continuous health care coverage under the operative plan in effect when said Plaintiff, "Martinez" was in the employ of the Defendant, "Savvy".  29 U.S.C. sec. 1161-1168.

69.    Upon information and belief, Defendant, "Savvy" failed to offer the Plaintiff, "Martinez" COBRA benefits as required.

70.     Said failure to offer the "COBRA" as mandated by law by the Defendant, "Savvy" entitles the Plaintiff, "Martinez" to seek statutory damages as provided for under 29 U.S.C. sec. 1132(c)(1).

71.     Upon information and belief, said violation of the COBRA notification commenced on August 14, 2006 and continues through this date.

72.     As of this date, Defendant, "Savvy" is in violation of the COBRA notification provisions for 204 days.

73.     Under the provisions of 29 U.S.C. sec. 1132(c)(1), the Plaintiff, "Martinez" is entitled to seek recovery of $100.00 for each day the Defendant, "Savvy" was in violation of COBRA.

74.     Thus, the Plaintiff, "Martinez" is entitled to statutory damages in the amount of $20,400.00, plus additional statutory damages continuing until such date as the Defendant, "Savvy" complies with the applicable COBRA provisions.  The Plaintiff, "Martinez" is also entitled to attorney fees, as provided for in 29 U.S.C. sec. 1132(g)(1).

75.     Thus, there is now due an owing from the Defendant, "Woodbury" to the Plaintiff, "Andux", the sum of $20,400.00 plus interest, plus additional statutory damages to be determined at trial, plus attorney fees.

## AS AND FOR A FOURTH CAUSE OF ACTION

76.     Plaintiff, "Martinez " repeats and reiterates each and every allegation hereinbefore set forth, with the same force and effect as if set forth herein.

77.     Upon information and belief, the Defendant, "Peters" was the administrator for the health care plan of the Defendant, "Savvy".

78    Upon information and belief, the Defendant, *John Doe* was the administrator for the health care plan of the Defendant, "Savvy".

79.    Under the provisions of 29 U.S.C. sec. 1132(c)(1), the administrator of the health care plan is liable for the violations of the provisions of COBRA.

80.    Thus, Defendant, "Peters" and Defendant, *John Doe* are jointly and severally liable for the violations of COBRA.

81.    Thus, Defendant, "Peters" and Defendant, *John Doe* are jointly and severally liable for the statutory damages due to the Plaintiff, "Martinez", said damages in the amount of $20,400.00, plus additional statutory damages continuing until such date as Defendant, "Peters" and Defendant, *John Doe* comply with the applicable COBRA provisions.  The Plaintiff, "Martinez" is also entitled to attorney fees, as provided for in 29 U.S.C. sec. 1132(g)(1).

82.    Thus, there is now due and owing from the Defendant, "Peters" and Defendant, *John Doe* jointly and severally, to the Plaintiff, "Martinez" the sum of $20,400.00 plus interest, plus additional statutory damages to be determined at trial, plus attorney fees.

**WHEREFORE,** Judgment is demanded:

(1)    By Plaintiff, "Martinez" against the Defendant, "Savvy" in the amount of $35,513.21, plus the value of the deprived Pension and Welfare Program and out of pocket medical expenses, plus compensation in amount to be determined at trial that the Plaintiff would have earned had said Defendant abided by the terms of the Collective Bargaining Agreement, all such

12

monies due to the Plaintiff for the breach of the Collective Bargaining Agreement.

(2)     By Plaintiff, "Martinez" against Defendant, "Local 1120" and Defendant, "Carter", jointly and severally, in the amount of $35,513.21, plus the value of the deprived Pension and Welfare Program and out of pocket medical expenses, plus compensation in amount to be determined at trial that the Plaintiff would have earned had said Defendants abided by the terms of the Collective Bargaining Agreement, all such monies due to the Plaintiff for the breach of the Collective Bargaining Agreement, said Plaintiff a known third party beneficiary of the Collective Bargaining Agreement.

(3)     By Plaintiff, "Martinez" against Defendant, "Local 1120" and Defendant, "Carter", jointly and severally, in the amount of $35,513.21, plus the value of the deprived Pension and Welfare Program and out of pocket medical expenses, plus compensation in amount to be determined at trial for the breach of the duty of fair representation by Defendants, "Local 1120" and "Carter" against the interests of said Plaintiff.

(4)     By Plaintiff, "Martinez" against Defendant, "Savvy" in the amount of $20,400.00, plus accruing statutory damages, plus interest and attorney fees and expenses for non-compliance of COBRA.   Said non-compliance entitles the Plaintiff, "Martinez" to damages under 29 U.S.C. sec. 1132(c)(1) and attorney fees pursuant to 29 U.S.C. sec. 1132(g)(1)

(5)     By Plaintiff, "Martinez" against Defendant, "Peters" and Defendant, *John Doe*, jointly and severally in the amount of $20,400.00, plus accruing

statutory damages, plus interest and attorney fees and expenses for non-compliance of COBRA.    Said non-compliance entitles the Plaintiff, "Martinez" to damages under 29 U.S.C. sec. 1132(c)(1) and attorney fees pursuant to 29 U.S.C. sec. 1132(g)(1).

(6)    Granting the Plaintiff, such other and further relief as the Court deems just and proper.

Dated: New City, New York
       March 5, 2007

_____
BARRY D. HABERMAN, ESQ. (bh 2589)
Attorney for the Plaintiff
PAUL MARTINEZ
254 South Main Street, #401
New City, New York 10956
845-638-4294

# AGREEMENT


## BETWEEN


# COMMUNICATIONS WORKERS OF AMERICA (AFL-CIO), DISTRICT ONE


## AND


# P.M. SAVVY FLEET SERVICES


**Effective:** 05/01/05
**Expires:**   04/30/09

# Table of Contents

| **Article** | **Title** | **Page** |
|---|---|---|
| 29 | Amendment | **17** |
| 21 | Bereavement | **14** |
| 16 | Discipline and Discharge | **10** |
| 15 | Dispute Adjustments | **10** |
| 6 | Dues Check off | **5** |
| 31 | Effective Dates and Duration | **18** |
| 10 | Force Adjustment | **8** |
| 19 | Holidays | **13** |
| 9 | Job Posting | **6** |
| 2 | Jurisdiction | 3 |
| 22 | Jury Duty | **14** |
| 14 | Layoffs and Recall | **9** |
| 25 | Licenses and Certifications | **15** |
| 20 | Military Leave | **14** |
| 13 | Overtime Wage Rates and Distribution | **9** |
| 30 | Pension and Welfare Program | **17** |
| 24 | Personal Leave | **15** |
| 1 | Recognition | 3 |
| 8 | Seniority | **6** |
| 23 | Sick Leave | **14** |
| 18 | Travel Reimbursement | **12** |
| 28 | Separability | **16** |
| 7 | Strike and Lockout Prohibition | **6** |
| 12 | Subcontracting | 9 |
| 3 | Successorship | **3** |
| 26 | Uniforms and Safety Shoes | **15** |
| 4 | Union Security | 4 |
| 5 | Union Status and Rights | 5 |
| 17 | Vacations | **11** |
| 27 | Wage Rates and Job Description | **16** |
| 11 | Work Time | **8** |

This is an agreement between P.M. Savvy Services, (herein, "Employer") and the Communications Workers of America (AFL-CIO), District One, 80 Pine Street, New York, New York, 10005, (herein, "Union").

## 1.  RECOGNITION

1.01    The Employer hereby recognizes the Union as the exclusive bargaining representative for the purpose of collective bargaining with respect to rates of pay, wages, hours of employment, and other conditions of employment, for all of its Mechanical Maintenance personnel servicing the Verizon Fleet in the jurisdiction defined in 2.01.

1.02    The term "Employer" or "Company" as used herein shall mean P.M. Savvy Fleet Services.

1.03    The term "C.W.A." or "Union" as used herein shall mean the Communications Workers of America, AFL-CIO.

1.04    The term "Local Union" as used herein shall mean C.W.A. Locals are designated in article 2.01.

## 2.  JURISDICTION

2.01    Each employee will be represented by the appropriate Local Union indicated below:

**Local 1111, 1114, 1115, 1117, 1120, 1122, 1124, 1126, 1128**

## 3.  SUCCESSORSHIP

3.01    The Company agrees not to sell or assign its business without expressly providing in the contract of sale or assignment that the Purchaser or Assignee shall be bound by all of the contract rights of the employees under this collective bargaining agreement (the "Agreement").

# 4. UNION SECURITY

4.01    Each employee who is a member of the Union on the effective date of this Agreement shall, as a condition of employment, remain a member. Each employee who is not a member, as a condition of employment, shall, no later than thirty-one (31) days after his* employment or the effective date of this Agreement, whichever is later, become and remain a member of the Union. On written notice from a duly authorized Union official that an employee who has been employed for more than thirty days has failed to tender the periodic dues and initiation fees uniformly required as a condition of acquiring and retaining membership in the Union, the Employer will discharge such employee within seven days after receipt of such notice unless within such seven days, such employee's failure to tender such dues and initiation fees is cured.

4.02    The Employer will notify the union in writing within five (5) business days of any new employee, his date of hire and assigned permanent work location. If an employee's employment is terminated for any reason other than as stated in Article 15, the Employer agrees to notify the Union in conjunction with the dues deduction manifest for the month following such termination.

4.03    The Employer may hire employees as permanent "rovers" within each Local Union's jurisdiction. The purpose of the "rover" is to provide temporary coverage for permanently placed employees who are absent from the job for any reason or for additional coverage. In the event an opening in a permanent work location becomes available, the " rover", in addition to the provisions in article 9.02 shall be offered the position in the permanent location prior to hiring a new employee.

4.04    The management of the Company's operations and the direction of the working force are vested exclusively in the Company. Except as expressly limited by this Agreement, the Company retains the sole right to determine all matters pertaining to the work force, including, but not limited to, the right to hire, train, and with just cause, discipline, demote, suspend, or discharge; lay off by inverse seniority and qualification; and promote by seniority and qualifications, to determine or change starting and quitting time and number of hours to be worked; to promulgate reasonable rules and regulations; to subcontract work; to assign duties to the work force; to create, change, combine or eliminate jobs; to effectuate layoffs; to determine job duties, qualifications, classifications and requirements; to organize, discontinue, enlarge or reduce a department, function, plant or division; to combine departments or to separate departments and to assign or transfer Employees to other departments or shifts as operations may require; to establish productions standards and methods; to select, change, remove and install machinery and equipment; to introduce new or improved facilities and to carry out the ordinary and customary functions of management whether or not possessed or exercised by the Company prior to the execution of this Agreement. The aforementioned rights are not to be interpreted as being all-inclusive, but merely indicate the type of rights, which belong to and are

4

inherent to management. It is understood and agreed that any of the rights, power or authority the Company had prior to the signing of the initial agreement are retained by the Company, except those rights which are specifically abridged, granted, or delegated to others or modified by this Agreement.

*Whenever the masculine gender is used as a description, it is intended to include the masculine and feminine gender.

## 5. UNION STATUS AND RIGHTS

5.01   **Stewards:**  The Union will notify the Employer in writing of the stewards (and their alternates in case of absence of any Union representative) authorized to administer this Agreement on behalf of the Union and the Employer shall recognize no others.

5.02   **Access:**  An authorized non-employee Union representative shall have access to Employer's premises and work area to ascertain whether conditions of this Agreement are being observed, provided there is no interruption of service.

5.03   **Administration:**  Those described in 5.01 and 5.02 shall be permitted to transact Union business directly related to the administration of this Agreement on the Employer's premises and work area, and at times and places which shall not interfere with or interrupt the Employer's activities or any employee's performance of employment duties or responsibilities. If Employer believes this privilege is being abused, it shall give written notice to the Union which shall then endeavor to correct the situation to the mutual satisfaction of the parties. Subject to the foregoing conditions, a steward shall sustain no loss of pay.

5.04   **Bulletin Board:**  A suitable bulletin board space shall be provided at the Employer's premises or work area for Union's exclusive use.

## 6. DUES CHECKOFF

6.01   Provided the Employer has received from an employee on whose accounts such deductions are to be made, a signed written request on a payroll deduction authorization form, the Employer will deduct bi-weekly from that employee's wages, the amount specified in that request. The Employer will forward the amounts deducted to the Union's Secretary/Treasurer of each Local or his authorized agent.

6.02    Payroll deductions will be made in bi-weekly pay periods for properly executed deduction authorization forms received at the Employer's headquarters on or before the fifth day of the preceding month. However, the Employer assumes no responsibility to the employee or Union for its failure to make or for any errors made in making such deductions, but will make such efforts, as it deems appropriate to correct errors or omissions, if any.

6.03    Deductions shall be remitted to the Union's Secretary/Treasurer of each Local no later than twenty (20) days after the end of the preceding month during which the deductions were made.

6.04    The Employer agrees to furnish the Union's Secretary/Treasurer of each Local at the time it remits the dues deducted, a roster of all employees' names, addresses, social security numbers, weekly rates of pay, dates of employment, marital status, dependents and dues deduction, or if no deduction was made, the reason for not making a deduction.

6.05    An employee's authorization shall be automatically canceled upon termination of employment.    An employee's authorization shall be suspended upon leave of absence in excess of thirty (30) calendar days.

6.06    Upon return from leave of absence, the returning employee's deduction authorization shall be reinstated in accordance with 6.02.

6.07    Any change in the amount of monthly Union dues will be certified to the Employer by the Secretary/Treasurer of each Local.  A certificate which changes the contributions due the Union shall become effective the first day of the month following the date the Employer receives such certification.


## 7.    STRIKE AND LOCKOUT PROHIBITION


7.01    There will be no strike, work stoppage, work interruption, slowdown, sympathy strike, picketing or boycott by the Union or any employee, and no lockout by Employer during the life of this Agreement.

7.02    No employee shall be subject to discipline for refusing to cross a lawful and primary picket line that has been authorized or recognized by the Union.


## 8.    SENIORITY


8.01    **Definition:**    Company seniority shall be defined for the purpose of this

Agreement as the net credited service date of the employee. Net credited service shall mean continuous employment with the employer **and the prior employer, "Butler Fleet Services, Inc.",** beginning with the date on which the employee began work after being hired and including any time spent in the armed forces, interrupting otherwise continuous employment. **The Union and the Company agree to immediate bridging of all net credited service as defined above.**

8.02   **Probation:**   Every new employee will be on probation for a period of sixty (60) workdays. During that probationary period the new employee shall have no seniority and may be  discharged  at the  Employer's will.  However, the Union's claim that the
discharge was without just cause shall be subject to the grievance provision of this Agreement but shall not be subject to arbitration. Upon completion of sixty (60) workdays of service, or sooner at the Employer's option, the new employee shall become a regular employee with seniority retroactive to his date of hire.

8.03   **Seniority Rights & Recall:**   All seniority rights and all other rights under this Agreement, shall be lost if any of the following occurs: (a) an employee quits employment; (b) an employee is discharged for just cause; (c) an employee is absent from active employment for one year; (d) an employee fails to return to work within ninety-six (96) hours after notification of recall is received, via US Mail, return receipt requested, to the last   address  the   employee   supplied  to  the Employer.   Under   extraordinary circumstances, the employee will have up to one week to return after notice of recall is received.   An employee promoted or transferred out of the bargaining unit for a period in excess of thirty (30) days, shall have the time worked outside the bargaining unit deducted from his net credited service date upon his return to the bargaining unit.

# 9.  JOB POSTING

9.01   All job vacancies, or force adjustments, existing or newly created, along with the qualification required, covered by this Agreement shall be posted for a period of ten (10) working days and a copy of the posted vacancies sent to each Local.  Any employee may apply in writing for the posted job to his immediate supervisor or his designated representative during this period.

9.02   The employee with the most seniority shall be selected  provided he possesses the qualifications as identified in the job postings.

9.03   The Employer shall fill two (2) out of three (3) job vacancies through the procedure in Articles 9.01 and 9.02 before hiring.

## 10.  FORCE ADJUSTMENT

10.01    As a means of force adjustment, the Employer may permanently transfer an employee within the jurisdiction of each Local Union.  If no permanent position is available within that Local Union jurisdiction, the Employer may then transfer to another Local Union jurisdiction as a means of avoiding layoff.  First, the Employer will look for a volunteer and in the absence of a volunteer the most junior employee will be forced.

## 11.  WORK TIME

11.01    The basic workday will be eight (8) hours, exclusive of a thirty-minute meal period (which will not be considered time worked).  The basic workweek for each full time employee will be forty (40) hours, Monday through Saturday.

11.02    Any permanent change in the basic workweek or workday will be announced at least one week in advance of the change.  Temporary changes to meet business needs may occur from time to time.  However, when the Employer is unable or fails to give at lease one week's notice, the employee shall be paid as follows:

    a)   The basic hourly rate or all hours during his regular tour, whether worked or not.
    b)   Time and one-half for all hours worked outside his regular tour.

The provisions stated in "a" and "b" above shall not be applied in the event of an urgent situation or an emergency ha s been declared by Verizon.

11.03    It is recognized that the nature of the Company's operations is such that it may require the employment of part-time employees.

11.04    A full-time employee shall be assigned to work forty (40) hours in a workweek.

11.05    A part-time employee shall be assigned to work up to twenty-five (25) hours in a workweek.  All part-time employees will be eligible for all benefits on a prorated basis.  The Employer will contribute fifty (50%) percent of the normal full-time contribution rate to the medical plan.  The Employer will contribute to the pension plan at the normal rate per hour for hours worked.

**11.06 Night tour is a tour that starts or ends after 12:00 A.M. or before 6:00 A.M. The differential for a night tour shall be twenty-five (25) cents added to the employees basic hourly wage rate for the hours worked between 12:00 am and 6:00am only.**

**11.07 Flexible Work Schedule** – The Employer and the Union agree to a flexible work schedule that allows the Employee to request and work a ten (10) hour work day four (4) days a week to complete the forty (40) hour work week without incurring premium pay, when requested by the Employee. Mutual agreement by both the employee and the employer is necessary for the flexible work schedule.

## 12.   SUBCONTRACTING

12.01    If for any reason the Employer desires to contract or subcontract bargaining unit work, it is the earnest intent that the aforementioned contracting or subcontracting will not result in an eroding of the bargaining unit or the curtailing of work of the bargaining unit and such contracting or subcontracting will not be used as a Union busting tactic. The Employer is relieved of any obligation for work contracted or subcontracted by Verizon.

## 13.   OVERTIME WAGE RATES AND DISTRIBUTION

13.01   Overtime shall be paid for work in excess of eight (8) hours in any workday, **except for "flex-time" as described in Article 11.07.**  All overtime hours will be paid at the rate of one and one-half (1 ½) times the normal hourly rate.  Overtime may only be worked with authorization from the Employer.

13.02   Overtime will be granted on a seniority basis at each work location.  The most junior person, based on qualifications, must work the required overtime if all senior people, in the location for which the overtime is being asked, refuse the overtime.

13.03   An employee will be paid only for time worked.  Planned paid time off including vacation, personal leave, holidays and absence for union business shall be considered as time worked for the purpose of applying provisions of this article.

13.04   All time, worked on a Sunday will be paid at two (2) times the employee's basic hourly wage rate (double time).

## 14.   LAYOFFS AND RECALL

14.01   For purpose of layoff, inverse order of seniority within the jurisdiction of each Local Union shall be used.

14.02   In the event of a re call, the Employer shall recall by order of seniority within

the jurisdiction (using the procedure outlined in Article 8.03, senior person will be recalled first and so on). Recall is subject to seniority order.

14.03   The Employer agrees to ask for "voluntary" layoffs by order of seniority before implementing any provision of this article.

## 15.   DISPUTES ADJUSTMENTS

15.01   **Scope & Steps:**  Except as otherwise stated in this Section, any dispute between Employer and Union will be adjusted in this way.

15.02     **First Step:**  The grievance shall be initially presented to the appropriate authorized representative of the parties or their alternates at the immediate supervisory level of the Company and the designated Union representative.   The grievance review shall be held promptly and a reply given within seven (7) calendar days from the time of its initial presentation.

15.03   Second Step:  If the grievance has not been satisfactorily adjusted, as provided for in 15.02, within thirty (30) days of the first step grievance consultation, the Union's representative and Employer's designated representative will consult with each other in an effort to adjust it.   The reasons stating the parties' position will be exchanged in writing at this meeting.

15.04     **Third Step:**  If the parties fail to adjust the grievance, the parties will, within forty-five (45) calendar days, refer the dispute to the New York State Mediation Board by written notice requesting that agency to provide panels from which the arbitrator will be selected.

15.05   **Arbitrator's Jurisdiction and Cost:**  The arbitrator's decision shall be final and binding upon the parties.   The compensation and expenses of the arbitrator shall be divided equally between the Employer and the Union.   Grievances may be taken to arbitration only by the Union or the Employer.

15.06   **Meeting Dates and Times:**  The date, time and location for a grievance hearing shall be fixed by agreement between the Union and Employer.

## 16.   DISCIPLINE AND DISCHARGE

16.01   Except that a new employee will be on probation for the first sixty (60) workdays and subject to discipline at Employer's will, no regular employee will be disciplined or discharged without just cause.

16.02   An employee apparently subject to summary discharge shall first be  placed on an

immediate ten (10) day suspension, without pay, pending discharge, to afford the Union an opportunity to pursue the circumstances with the Employer. On receipt of written notice pursuant to 15.01, the Union will, within fifteen (15) days, schedule a **second** step meeting as described in **15.03**.

16.03   Except in instances where an employee's misconduct constitutes just cause for summary discharge, the Employer subscribes to the principle of progressive discipline, a progression consisting of a written warning, followed by a one (1) day suspension without pay, followed by a three (3) day suspension without pay, followed by a more extensive discipline up to and including discharge.

16.04   The Company agrees to furnish the Local Union and Shop Steward, as soon as possible, copies of all written warnings and suspensions given to any of its employees. It is understood that the Local Union will be notified prior to any disciplinary action and be present at any such meeting upon the employee's request, provided the Union responds in a timely manner.

16.05   The Employer reserves the right to discipline its employees with just cause and establish and amend the work rules and procedures after notice to the Union and subsequent good faith negotiation with the Union if these changes are deemed blatantly unreasonable.

## 17. VACATIONS

New employees are entitles to one (1) week vacation in the current calendar year if their employment started before June 30th.
Employees will receive two (2) weeks vacation in the calendar year after they accrued one (1) year of service.
**Employees will receive an additional two (2) days vacation in the calendar year after they have accrued six (6) years of service.**
Employees will be entitled to three (3) weeks vacation in the calendar year after they have accrued seven (7) years of service.

17.02   All vacations shall be considered earned on the anniversary date of employment.

17.03   Vacation pay shall be paid on the last payday immediately preceding the employee's vacation, provided the employee submits a request for vacation pay at least two (2) weeks before the start of his vacation. If the employee does not make a request for vacation pay two (2) weeks in advance, he may not receive his vacation pay until the next payroll week.

17.04  The scheduling of available vacation weeks shall be such that no more than ten percent (10%) of the employees in Mechanical Maintenance classifications within a CWA's jurisdiction will be permitted to be on vacation at any time during the calendar year.

17.05  Selections of vacations by seniority shall begin November 15th and shall be completed by January 1st.  An employee's request to change his vacation selection shall be granted provided the week is available an approved by the Employer. Vacations can be carried over from year to year if specifically requested of and approved by the Employer.

17.06  A vacation must be taken by whole weeks. Vacation may be taken in individual days, when agreed to by both parties.

17.07  With Employer's written approval, an employee may work his vacation and be paid at **(100%) one hundred percent** the normal hourly wage rate for the vacation not taken.  In addition the employee will be paid at the normal hourly rate for hours actually worked.

17.08  On termination, an employee shall receive his accrued vacation pay.

# 18. TRAVEL REIMBURSEMENT

18.01  When an employee is required to report to a job site, other than this normal work location, the Employer will reimburse the employee for the mileage in excess of the mileage from his home to his normal reporting point at the current Internal Revenue Service non-taxable rate.  All employees hired as a "rover" within the jurisdiction of each Local Union will consider his reporting point each morning as his normal reporting point.

18.02  When an employee is requested to transport material or capital tools to a job site outside his normal work tour, the employee reserves the right to refuse.

18.03  When an employee is required to report to a location more than seventy-five (75) miles from his normal reporting point, board and lodging will be provided by the Employer.   The lodging will be an Employer provided residence at the Employer's expense and the employee will receive a daily meal allowance of **$40.00** for each night's lodging.  For the purpose of this article, the Employer will assign the "rover" a work site central to each Local Union's jurisdiction.

18.04  **Travel Time:**  When an employee is required to report to a job site as described in 18.03, the customary time required to be spent by the employee in traveling between his home and the job site at the start and completion of the assignment shall be treated as work time and paid at the employee's appropriate rate.

# 19. HOLIDAYS

19.01    The following holidays will be observed as holidays by the Company:

| | |
|---|---|
| New Year's Day | Labor Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |
| **Day after Thanksgiving\*** | **Martin Luther King Jr.\*** |
| 1 Floating Holiday | |

**\* At the Employee's request, Martin Luther King Jr. Day and the Day after Thanksgiving shall be treated as floating Holidays.**

19.02    **Eligibility & Pay:**  An employee not required to work on a holiday will be paid for eight (8) hours at his basic wage rate providing he received paid time the  day before or the day after the holiday.

19.03    **Holiday Work:**   Employees who work on a holiday will be paid at one and one-half times the basic wage rate for work performed on a holiday, in addition to receiving holiday pay, if conditions under 19.02 are met.

19.04    If a holiday occurs on a Saturday or Sunday, the holiday will be observed on the Friday preceding a Saturday holiday or on the Monday following a Sunday holiday.

19.05    When a holiday falls in an employee's vacation, the Employer, after considering any specific requests of the employee, shall designate another day within the calendar year to be treated as the holiday for the employee or a day's pay in lieu of the time off.

19.06    All part time employees will be paid four (4) hours pay at their normal rate for all holidays listed in 19.01.

19.07    An employee's request for a day off as a floating holiday will be granted by his immediate supervisor based on availability.  An employee may choose to be paid for an eight (8) hour day at his normal rate of pay in lieu of the time off.
If the employee is denied his or her request to take the floating holiday, the employee may choose to work the day and be paid at the holiday rate of pay as prescribed in 19.03, or at his option may select another floating holiday.

## 20. MILITARY LEAVE

20.01    Employees who have a military obligation may request a two (2) week leave of absence and will be paid the difference between their gross military pay and their straight time hourly rate of pay, not to exceed forty (40) hours per week.  To qualify, an  employee must submit to his supervisor his military orders directing him to report for duty.  Probationary employees are ineligible for a paid leave of absence.

## 21. BEREAVEMENT LEAVE

21.01    After an employees probationary period, an employee will be paid for a three (3) day leave of absence at his regular wage rate, due to death of a grandparent, parent, parent-in-laws, step-parents, brother, sister, spouse, child, or step-child, **brother-in-law, sister-in-law, or life companion with whom the employee resides.**

## 22. JURY DUTY

22.01    After an employees probationary period, an employee who has jury duty will be paid the difference between jury duty pay and eight (8) hours pay at his regular wage rate base for each working day served, up to a maximum of ten (10) days per contract year.  Employees engaged in jury duty shall, while temporarily excused from attendance in Court, report for scheduled shifts during scheduled work time.   To qualify, an employee must submit to his supervisor his summons of jury duty.

## 23. SICK LEAVE

23.01    After twelve (12) months of employment, each employee will accrue one (1) paid sick day for each six (6) succeeding months of employment.   After twenty-four (24) months of employment, each employee will accrue one (1) paid sick day for every succeeding **three (3) months** of employment.
**Effective April 30, 2009, after twenty-four (24) months of employment, each employee will be entitled to five (5) paid sick days that shall accrue in equal increments within the calendar year.**

23.02    Employer may require evidence that the leave is being used properly.

23.03    For sick leave benefits an employee will notify his supervisor before his scheduled reporting time on the first day of absence.

23.04    Sick leave shall be applicable only if the employee is ill on days during which

he is normally scheduled to work.  The employee shall be paid at his straight time hourly rate of his normal workday of eight (8) hours.

**23.05   Unused sick leave can be carried over from year to year.**

**23.06 Employees may sell back to the Company any or all their unused accrued sick leave, and be paid at the rate of one hundred twenty-five percent (125) of the basic hourly wage rate as prescribed in Article 27.**

23.07 **Upon termination of employment the employer shall pay the employee for ninety percent (90) of sick days accrued.**

23.08 An employee out due to a compensation or disability claim must file the necessary claim papers to receive a weekly paycheck.

23.09 Disability Absence:   The Employer has the right to permanently replace an employee after nine (9) months of a continued disability absence.   After six (6) months of continuous disability the Employer has the right to discontinue the Employer provided medical insurance.  Thirty (30) days prior to discontinuing the medical coverage, both the Employer and the Union will notify the employee.

## 24.  PERSONAL  LEAVE

24.01   During  the  term  of  this  Agreement,  an  employee  may  request  one personal leave of absence in excess of thirty (30) days and not to exceed sixty (60) days.

## 25.   LICENSES  AND  CERTIFICATIONS

25.01   The employee must acquire a Commercial Driver's License (CDL) when the (90 days) client's vehicles at the employee's normal work location require the operator to possess a CDL to operate the vehicles.  The employer will reimburse the employee the cost of the renewal fees for the CDL.  Employees will obtain their CDL within ninety (90) days.

25.02   The Employer encourages continuing education.  The Employer will pay the fees required for any employee who **passes** certifications in the Automotive Service Excellence (ASE) Test Areas applicable to the client's vehicles.

## 26. UNIFORMS AND SAFETY SHOES

26.01    All employees must wear the Employer provided uniform, wear steel toe shoes, and maintain a neat and orderly appearance.  The Employee will be responsible for the laundering of all Company provided uniforms.  The Employer will reimburse the employee up to **ninety (90) dollars** per year for the steel shoes upon receiving a receipt for such purchase.

## 27. WAGE RATES AND JOB DESCRIPTION

27.01    Employees covered by this Agreement shall be placed in the class shown below and receive a wage rate as shown in 27.02.

Job Description
Mechanic    -    Must possess the ability to perform all preventive maintenance services, and troubleshoot and repair all types of vehicles and aerial equipment. Knowledge of electronic, electrical, air, hydraulic, fuel, cooling systems and welding.  Ability to perform road service which may entail troubleshooting and component replacement, ability to perform daily paperwork and communications.

27.02    Each employee shall receive an hourly wage increases for the term of this agreement. The schedule of wage increases shall be as follows:
**All employees, working for the employer on May 1, 2005, shall receive a contract bonus of one hundred ($100) dollars upon ratification of the contract.**

| May 1, 2005 | 2.5% |
|---|---|
| May 1, 2006 | 2.5% |
| May 1, 2007 | 2.5% |
| May 1, 2008 | 2.5% |

The **hourly wage rate minimum** structure will become effective April 1, 2005

| | **Minimum rate** |
|---|---|
| May 1, 2005 | $17.00 |
| May 1, 2006 | $17.50 |
| May 1, 2007 | $18.00 |
| May 1, 2008 | $18.50 |

27.03    All new employees will be hired at the rates as determined by the Employer, but not less than the minimum pay scale as indicated.

# 28.  SEPARABILITY

28.01    Should any part hereof or any provision(s) herein contained be rendered or declared invalid by reason of any existing or subsequently enacted legislation or by decree of a court of competent jurisdiction, such invalidation of such part or portion of this Agreement shall not invalidate the remaining portions hereof, and they shall remain in full force and effect.  If any provision(s) are declared to be in conflict with the law, the parties agree to meet within a reasonable period of time to negotiate a substitute provision(s).

# 29.  AMENDMENT

29.01    **Bargaining Scope:**  In reaching this Agreement, Employer and Union have considered all matters lawfully subject to collective bargaining.

29.02    **Amendment Procedure and Obligation:**  The Agreement may be amended or supplemented only by further written agreement between Employer and Union.  A party desiring amendment or supplement desired; but the other party will not be obliged to discuss or agree to such proposed amendment or supplement.

# 30.  PENSION AND WELFARE PROGRAM

30.01    CWA/ITU  Negotiated Pension Plan.

Effective with the commencement of the Agreement, the Employer agrees to contribute to the CWA/ITU Negotiated Pension Plan (hereinafter sometimes referred to as the Plan) **effective May 1, 2005, forty (40) cents per hour, effective May 1, 2006 fifty (50) cents per hour, effective May 1, 2007, sixty five (65) cents per hour, effective May 1, 2008, eighty five (85) cents per hour.**  All calculations are based on a forty (40) hour workweek for each employee covered by this Agreement, for the purpose of providing pensions on retirement, death benefits, and other related benefits for covered employees of the Employer and other contributing Employers. Contributions shall be made for any shift for which an employee receives compensation (e.g. hours worked, sick leave, vacations, holidays, disability insurance, bereavement leave, or jury duty).    The Plan is jointly administered by Trustees appointed in equal numbers by the Union and Employers under an Agreement and

17

Declaration of Trust, and has been found by Internal Revenue Service to be entitled to exemption under the Internal Revenue Code.

Contribution shall be made by check, money order or similarly recognized medium of exchange, and shall be made payable and forwarded to the CWA/ITU Negotiated Pension Plan, PO Box 2380, Colorado Springs, Colorado 80901, no later than the 20th of the following month, together with reports submitted on forms to be furnished by the Plan.

Title to all moneys paid into the Plan shall be held exclusively by the Trustees in trust for use in providing the benefits under the Plan and paying its expenses.

The Employer recognizes that in addition to the Union's right to enforce this Section, the Union shall have the right in its discretion to take any legal action necessary to collect any contributions or moneys due and owing to the Plan and to secure delinquent reports. The Employer further agrees that the Union shall have the right to collect reasonable attorney's fees and expenses incurred in connection therewith. The Employer shall supply to the Local Union a copy of either the union representative's copy of Negotiated Pension Plan remittance forms or a copy of the Employer's printout forms on a monthly basis.

**30.02**      The Employer will maintain the availability of medical insurance coverage **that was available on March 31, 2005 for all bargaining unit employees. The employees will be required to pay fifteen percent (15%) of any increase above the negotiated benchmark rates each year of the contract, as noted below.**

As agreed the following are the benchmark rates as discussed above:

| Plan Year | Single | Single Plus 1 | Family |
|---|---|---|---|
| 9/1/2004 – 8/31/2005 | $ 412.60 | $   809.50 | $   903.20 |
| 9/1/2005 – 8/31/2006 | $ 458.00 | $   930.00 | $ 1002.00 |
| 9/1/2006 – 8/31/2007 | $ 517.50 | $ 1070.00 | $ 1133.00 |
| 9/1/2007 – 8/31/2008 | $ 600.00 | $ 1220.00 | $ 1303.00 |

**Employees may opt out of the medical plans each year. The employer shall pay the employee $2000.00 when opting out of the medical coverage. Payments shall be broken up into equal payments per pay period.**

## 31.   EFFECTIVE DATES AND DURATION

**31.01**   This Agreement shall become effective on May 1, 2005 and be in full force and effect until midnight April 30, 2009 and from year thereafter, unless either party notifies the other in writing, not earlier than ninety, nor later than sixty days prior to expiration of its intention to modify or terminate this Agreement.